T.C. Memo. 2002-5


UNITED STATES TAX COURT


SIGITAS J. BANAITIS, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 4323-00.                    Filed January 8, 2002.


<u>Joseph Wetzel</u> and <u>Michael C. Wetzel</u>, for petitioner.

<u>Shirley M. Francis</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


GERBER, <u>Judge</u>:  Respondent determined a $1,708,216 deficiency in income tax for petitioner's 1995 taxable year.  The issues for our consideration are:  (1) Whether petitioner is entitled to exclude damages received in settlement of a lawsuit

under section 104(a)(2);[1] (2) whether fees paid to petitioner's attorneys in accord with a contingent fee agreement are excludable from petitioner's gross income; and (3) whether respondent's determination violated petitioner's Fifth Amendment rights in the form of a Government taking without due process of law or just compensation.

## FINDINGS OF FACT[2]

At all pertinent times, Sigitas J. Banaitis (petitioner) resided in Clackamas County, Oregon. From 1980 through December 30, 1987, petitioner was employed by the Portland branch of the Bank of California, N.A. (BCal), as a loan officer and vice president. As such, petitioner solicited and maintained customers, mostly businesses, to whom BCal made loans. In so doing, petitioner and BCal obtained sensitive and highly confidential information, including information contained in financial statements. Loan customers were assured by both petitioner and BCal of confidentiality through oral assurances and written contracts.

In 1984, Mitsubishi Bank, Ltd. (MBL), a member of the Mitsubishi Group (MG), acquired a controlling interest in BCal.

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue.

[2] The parties have stipulated some of the facts. The stipulation of facts and the attached exhibits are incorporated herein by this reference.

Some of petitioner's loan customers competed directly with firms and enterprises of MG. During 1986 and 1987, MBL employees asked petitioner to provide confidential information about those specific loan customers. Adhering to his ethical and legal duties, confidentiality agreements and BCal policy, petitioner refused.

Subsequent to his refusal, MBL employees gave petitioner negative performance evaluations and attacked his integrity. This situation grew so intolerable for petitioner that on December 30, 1987, 1 day before his pension vested, petitioner was forced to leave his job at BCal.

Before and after petitioner left his job, he experienced insomnia, headaches, stomach problems, back and neck pain, and gum disease. Petitioner did not consider himself disabled, nor did he apply for disability insurance benefits. After he left BCal, petitioner actively searched for employment. He distributed resumes, went for job interviews, started businesses, and offered and performed consulting services.

On November 15, 1989, almost 2 years after petitioner was forced to leave BCal, petitioner retained the law firm of Merten & Associates to file a lawsuit against BCal and MBL. In so doing, petitioner signed an agreement entitled "Contingent Fee Retainer Agreement" (Fee Agreement I). Fee Agreement I provided that petitioner's attorneys would receive a percentage of

petitioner's gross recovery. They were to receive one-third in the event that an agreement was reached before trial. If a trial commenced, the fee increased to 40 percent. Settlement offers had to be discussed with petitioner, and an offer could not be accepted or rejected without his approval. Merten & Associates had an attorney's statutory lien and a possessory lien on petitioner's property in its possession.

Additionally, Fee Agreement I provided that if petitioner (1) breached the agreement, (2) did not cooperate, (3) unreasonably rejected a settlement offer, or (4) insisted on pursuing a claim contrary to the attorney's advice, the law firm could terminate its services and would be entitled to payment at an hourly rate for services rendered to date, plus costs. Petitioner could fire Merten & Associates, at any time, which would entitle it to a minimum payment of an hourly rate for their services. Fee Agreement I did not provide legal fees for the pursuit or defense of an appeal.

Having hired attorneys, petitioner filed a complaint in the Multnomah County Circuit Court for the State of Oregon on December 12, 1989. Altogether, petitioner filed four amended complaints, the last of which was filed on March 11, 1991.

Petitioner's complaints, as amended, contained two claims for relief. The first was against MBL for intentional interference with contract and economic expectations. The second

was against BCal for wrongful discharge from employment.  In both claims, petitioner alleged that MBL and BCal acted maliciously "with the intent to harm the plaintiff * * * [which was] socially intolerable."  Under this allegation, petitioner sought damages of $3 million from MBL and $2 million from BCal.  Petitioner also prayed for economic and noneconomic damages, as follows:  (1) Economic damages of $647,389--$196,889 for lost salary and benefits and $450,500 for lost future compensation; and (2) noneconomic damages for "stress, anger, worry, and loss of life enjoyment" in an amount to be determined by the jury after the trial.

On March 18, 1991, the jury returned a special verdict against BCal and MBL.  The jury found that (1) petitioner did not voluntarily resign his position at BCal, (2) MBL caused BCal to constructively discharge petitioner, (3) BCal intended to make working conditions so unacceptable that petitioner would resign, (4) BCal forced petitioner to resign because petitioner refused to disclose confidential information to MBL, and (5) petitioner's refusal was in furtherance of important public policy.  The jury allocated fault 80 percent to MBL and 20 percent to BCal.

The jury awarded petitioner the following damages:  (1) $196,389 for his lost compensation to date, (2) $450,000 for his lost future compensation, (3) $500,000 and $125,000 for emotional distress from MBL and BCal, respectively.  Further, because they

awarded petitioner compensatory damages, under Oregon law the jury was allowed to consider punitive damages. The jury found that the employees of both MBL and BCal were "guilty of wanton misconduct and acted within their employment." As such, the jury awarded punitive damages from MBL and BCal in the amounts of $3 million and $2 million, respectively.

In summary, the money judgment against MBL was $500,000 for noneconomic damages, $3 million for punitive damages and $646,389 for economic damages--$450,000 in lost future compensation and $196,389 in wages. The money judgment against BCal was $125,000 for noneconomic damages, $2 million for punitive damages, and $646,389 for economic damages. MBL and BCal were jointly and severally liable for the economic damages and severally liable for the noneconomic damages and the punitive damages. Petitioner was also entitled to postjudgment interest and costs of litigation.

Subsequently, MBL and BCal filed motions with the trial court for judgment notwithstanding the verdict. These motions were granted in part and the judgment set aside. At this point, petitioner was still entitled to compensatory damages, but no punitive damages. Petitioner and the banks, separately, appealed to the Oregon Court of Appeals.

For the legal fees occasioned by the appeal, petitioner and his attorney, Charles J. Merten (Merten), entered into a second

contingent fee agreement on July 22, 1991 (Fee Agreement II). It provided for various scenarios under which legal fees would be payable. Generally, Fee Agreement II provided that the fees would be computed as a percentage of petitioner's recovery.

Petitioner and Merten also entered into an agreement entitled "Letter Interpretation" (Letter) which was intended to govern the interpretation of Fee Agreement II. It provided that Merten's fee would be paid out of petitioner's punitive damages recovery. Again, it was clear that petitioner could fire his attorneys at any time, thereby entitling them to a prescribed amount of compensation.

On August 3, 1994, the Oregon Court of Appeals reinstated the jury verdict. Consequently, MBL and BCal filed an appeal with the Supreme Court of the State of Oregon. Before the appeal was completed, the parties reached a settlement.

On October 26, 1995, petitioner entered into a confidential settlement and a mutual release agreement with MBL and BCal. The total amount of the settlement was $8,728,559. Pursuant to the wording of the settlement agreement, MBL issued a cashier's check to petitioner for $4,864,547 and BCal issued a cashier's check to "[petitioner's] attorney, Charles J. Merten," for $3,864,012.

Under Oregon State law , Or. Rev. Stat. sec. 18.540 (1991), petitioner was required to pay a portion of his punitive damages award to the State. Petitioner initially disputed the

applicability of this statute but later settled with the State for $150,000. The firm of Merten & Associates did not pay any part of its $3,864,012 to the State of Oregon for this statutorily imposed liability.

Petitioner filed his 1995 Federal income tax return as married filing separately. He included a disclosure statement with his 1995 return explaining that the compensatory damages, the punitive damages, and the interest on the part of the award used to pay his attorney's fees were excludable from his gross income under section 104(a)(2). Accordingly, petitioner reported as income only the interest on the part of the award disbursed directly to him.

Respondent made the following determination concerning the litigation award:

| | |
|---|---|
| Total amount of damages awarded: | $8,728,559 |
| Less interest reported by the petitioner: | (1,421,420) |
| Less amount excluded, under I.R.C., sec. 104(a)(2) for emotional distress: | (625,000) |
| Increase to income reported by petitioner: | 6,682,139 |

Respondent allowed, as a miscellaneous itemized deduction, $3,317,316 for attorney's fees paid to Merten & Associates.

## OPINION

We consider three interrelated issues: (1) Whether any portion of damages received in settlement of petitioner's legal claim is excludable under section 104(a)(2); (2) whether the

amount paid under the settlement directly to petitioner's attorney is excludable from petitioner's gross income; and (3) whether any portion of the tax burden placed on petitioner's settlement proceeds violates his constitutional rights as a taking without due process of law or just compensation within the meaning of the Fifth Amendment of the U.S. Constitution.

I.  Exclusion for Damages

Section 61 defines gross income as "all income from whatever source derived".  While this definition of gross income is broad in terms of what it includes, exclusions from gross income are narrowly construed.  United States v. Burke, 504 U.S. 229, 248 (1992).  One such exclusion is provided for in section 104(a)(2): "damages received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal injuries or sickness" are excluded from gross income.

A.  Economic Damages

Petitioner received $646,389 in economic damages. Petitioner contends that section 104(a)(2) applies to exclude these economic damages from gross income.  In arguing that these proceeds are excludable, petitioner points out that under Oregon State law, his claims against BCal and MBL for wrongful discharge and intentional interference with economic expectations are torts.  As such, petitioner claims that damages received in connection with these torts are excludable under section

104(a)(2). However, petitioner's argument assumes that the origin of the claim is the only relevant inquiry. A two-part test for the section 104(a)(2) exclusion was established in Commissioner v. Schleier, 515 U.S. 323, 333 (1995). Schleier requires that, in addition to the law suit's being based upon a tort claim, the damages received must have been "on account of personal injuries or sickness". Id.

The factual circumstances in this case reflect that petitioner's economic damages were not "on account of personal injuries or sickness". Rather, petitioner's economic damages were intended to replace wages and other compensation lost when he was forced to leave his job. While in some circumstances economic damages measured by lost wages can satisfy the second prong of the Schleier test, petitioner's economic damages do not. For instance, if a taxpayer were unable to work as a direct result of his physical injuries, the economic damages he received to replace his lost wages would be excludable. Id.; Rev. Rul. 85-97, 1985-2 C.B. 50. In short, the taxpayer's physical injuries would have been the direct cause of his inability to work.

Although petitioner was forced to leave his job because of a tort and he had manifestations of emotional distress, he was not forced to leave his job because of those injuries. Rather, he was forced to leave because he refused to disclose confidential

information.  The damages were intended to replace salary and benefits wrongfully taken from him "on account of" his constructive discharge--not because of any personal injury. Moreover, petitioner's injuries did not prevent him from working at all--at BCal or elsewhere.  We note that, after leaving BCal, petitioner actively searched for employment and was self-employed.

Accordingly, petitioner's economic damages are not "on account of personal injury or sickness" and as such, do not meet the Schleier test.  Petitioner's economic damages are not excludable from his gross income.

B. Punitive Damages

Petitioner also received $5 million in punitive damages.  As with his economic damages, petitioner claims that section 104(a)(2) applies to exclude this amount from his gross income.

Petitioner would have us accept his interpretation of the following legislation added to section 104(a)(2) in 1989: "Paragraph 2 [excluding from gross income any damages received on account of personal injuries or sickness] shall not apply to any punitive damages in connection with a case not involving physical injuries."  Petitioner contends that the use of a double negative in this phrase creates a positive.  In other words, petitioner believes that Congress intended for all punitive damages to be excludable from gross income in any case involving physical

injuries or sickness. Petitioner's argument was addressed and rejected by the Supreme Court in O'Gilvie v. United States, 519 U.S. 79, 89-90 (1996).

Petitioner has gone to great lengths in his attempt to support his interpretation, including citations and references to judicial commentary, syntax doctrines, and comparisons to other sections of the Internal Revenue Code. However, the Supreme Court has held that section 104(a)(2) does not exclude punitive damages from income even if awarded in a case involving physical injuries or sickness. Id.

Furthermore, petitioner's award of punitive damages was not intended to compensate for physical injuries. The punitive damages were intended to punish BCal and MBL and to deter them from future misconduct. When awarding petitioner punitive damages, the jury found that the employees of BCal and MBL were guilty of wanton misconduct and acted within the scope of their employment. Accordingly, we find petitioner's statutory interpretation is flawed.

To exclude his punitive damages from income, petitioner must satisfy section 104(a)(2) and the two-prong Schleier test. However, we have already held that while the damages arose from tort-based claims, they were not on account of physical injuries or sickness. Therefore, petitioner's punitive damages are not excludable from his gross income.

As such, we agree with respondent's position in that the noneconomic damages were the only damages excludable under section 104(a)(2). Petitioner must include his economic and punitive damages within his gross income for taxable year 1995.

II. Attorney Contingent Fee Agreements

Petitioner also seeks to exclude from his gross income $3,864,012, the portion of the settlement BCal paid directly to Merten, his attorney, pursuant to the two contingent fee agreements. Here again, we consider the broad reach of section 61 and whether, under some theory, the amount paid to petitioner's attorney should be excluded from gross income. Numerous taxpayers have attempted to find some approach for excluding from income the portion paid to their attorneys from judgment or settlement damages. This Court has not approved any such approach except where the case was appealable to a Court of Appeals with a contrary view.

This Court in Kenseth v. Commissioner, 114 T.C. 399 (2000), affd. 259 F.3d 881 (7th Cir. 2001), held that a contingent fee agreement did not result in an excludable assignment of income from the taxpayer. See Helvering v. Horst, 311 U.S. 112 (1940); Lucas v. Earl, 281 U.S. 111 (1930). In addition, we observed that the right created in an attorney pursuant to a contingent fee agreement was the right to be paid for services rendered--a right created in any creditor-debtor relationship. Under this

holding, proceeds of a judgment or settlement which would be includable in the taxpayer's income if paid directly to the taxpayer, and which are instead paid to a taxpayer's attorney pursuant to an attorney contingent fee agreement are income to the taxpayer. Kenseth v. Commissioner, supra. The Court of Appeals for the Seventh Circuit recently affirmed this holding. Kenseth v. Commissioner, 259 F.3d 881 (7th Cir. 2001).

We recognize that there is a split among the Courts of Appeals on this question. The Court of Appeals for the Fifth Circuit, in Cotnam v. Commissioner, 263 F.2d 119 (5th Cir. 1959), affg. in part and revg. in part 28 T.C. 947 (1957), held that an attorney's lien under Alabama law provided the attorney with a property right in the lawsuit. Therefore, the court held that the proceeds paid directly to the attorney pursuant to a contingent fee agreement constituted the attorney's property and were not income to the taxpayer. The Court of Appeals for the Sixth Circuit, on a somewhat different theory, held that fees paid to an attorney under a contingent fee agreement are not income to the taxpayer. Estate of Clarks ex rel. Brisco-Whitter v. United States, 202 F.3d 854 (6th Cir. 2000). On the other hand, the Courts of Appeals for the Third, Seventh, Ninth and Fourth Circuits have disagreed with the Fifth and Sixth Circuit's reasoning. Kenseth v. Commissioner, 259 F.3d 881 (7th Cir. 2001); Young v. Commissioner, 240 F.3d 369 (4th Cir. 2001), affg.

113 T.C. 152 (1994); Coady v. Commissioner, 213 F.3d 1187 (9th Cir. 2000), affg. T.C. Memo. 1998-291; O'Brien v. Commissioner, 319 F.2d 532 (3d Cir. 1963).

In a recent case, the Court of Appeals for the Ninth Circuit[3] held that a defendant's payment of a plaintiff's attorney's fees under a fee shifting statute results in income to the plaintiff. Sinyard v. Commissioner, 268 F.3d 756 (9th Cir. 2001), affg. T.C. Memo. 1998-364. That same result pertains even though the attorney was hired under a contingent fee agreement. Id. In Sinyard, the court applied the discharge of indebtedness and constructive receipt doctrines as the rationale for its holding.

We find nothing in the case at bar to cause us to differ from our previous analyses in this regard. The fact that the attorney's fees were paid directly from petitioner's settlement proceeds does not alter the amount of petitioner's total settlement recovery. Petitioner settled the case for $8,728,559. The defendants wrote one check to petitioner for $4,864,547 and one check to petitioner's attorney, Charles J. Merten, for $3,864,012. The fact that two checks were written does not change the facts that (1) petitioner was owed $8,728,559 from the defendants for the settlement amount and (2) Merten was

_____

[3] Petitioner's case would be appealable to the Court of Appeals for the Ninth Circuit.

owed $3,864,012 from petitioner for services rendered. The payment structure is immaterial.

Petitioner has set forth an alternative argument. He argues that, in spite of Sinyard v. Commissioner, supra, the Court of Appeals for the Ninth Circuit would not apply Federal tax law in this case. Instead, petitioner contends that Oregon law would apply to determine whether a property right in the settlement proceeds had been created in the attorney under the contingent fee agreement. Petitioner contends that as Oregon law gives the attorney such a right, the Court of Appeals would disregard Kenseth and Sinyard.

In spite of petitioner's argument, we find nothing in Oregon law which provides an attorney hired under a contingent fee agreement with anything more than a right to compensation for services rendered. When BCal directly paid petitioner's attorneys, it merely paid the fees petitioner already owed to petitioner's attorney. Indeed, the settlement agreement explicitly stated that BCal would pay "defendant's attorney, Charles Merten".

In addition, the Court of Appeals for the Ninth Circuit explicitly rejected the reasoning in Cotnam v. Commissioner, supra. The court stated: "We do not see how the existence of a lien in favor of the taxpayer's creditor [taxpayer's attorney] makes the satisfaction of the debt any less income to the

- 17 -

taxpayer whose obligation is satisfied." Sinyard v.
Commissioner, supra at 760.

We also note that Merten did not pay any of his $3,864,012
to the State of Oregon under Or. Rev. Stat. sec. 18.540 (1991),
which claims a percentage of all punitive damages awards. Under
Fee Agreement II, Merten's fee was to come out of the punitive
damages. The settlement proceeds replaced the jury verdict.
Therefore, if Merten were a real party in interest with respect
to that $3,864,012 settlement, and did not receive it instead to
discharge petitioner's obligation to compensate him for services
rendered, Merten should have paid the State of Oregon a portion
of his proceeds.

Consequently, we hold that the portion of the damages,
$3,864,012, paid directly to petitioner's attorney is includable
within petitioner's gross income.

III. Constitutionality

Petitioner claims that respondent's determination violated
his constitutional right against a Government taking without due
process of law or just compensation. Petitioner points out, that
after attorney's fees, the Federal alternative minimum tax, and
the State of Oregon tax, he would be left with only $1,984,078.
This amount is 22.7 percent of the total settlement of

$8,728,559.[4]  Petitioner claims that, as this is such a small percentage of the total settlement, the application of the alternative minimum tax is unconstitutional.

However, the Court of Appeals for the Ninth Circuit, to which petitioner's case is appealable, has spoken on this subject.  In Okin v. Commissioner, 808 F.2d 1338, 1342 (9th Cir. 1987), affg. T.C. Memo. 1985-199, the Ninth Circuit stated that the Due Process Clause does not limit the congressional power to tax.  Moreover, the Court specifically stated that the "alternative minimum tax is a rational means of * * * tax, and * * * is constitutional."  See also Sinyard v. Commissioner, supra at 760.

To the extent not herein discussed, we have considered all other arguments made by the parties and find them to be moot or without merit.

To reflect the foregoing,

Decision will be entered

for respondent.

---

[4] We find it curious that petitioner claims his recovery was $8,728,559 for purposes of making his constitutional argument while he claims his recovery was only $4,864,547 for other arguments in his brief.