T.C. Memo. 2003-339

UNITED STATES TAX COURT

GAVIN POLONE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 12665-00.              Filed December 16, 2003.

P was a high-profile, successful Hollywood talent
agent.  P represented numerous Hollywood stars.  Until
1996, P worked for a major Hollywood talent agency (U).

On Apr. 21, 1996, U fired P.  U leaked P's
termination to the media.  The press coverage of P's
termination was extensive and defamatory to P.

P immediately hired attorneys to represent him
against U.  P's attorneys prepared a complaint
alleging, among other things, defamation and breach of
contract.  P and U engaged in settlement negotiations
that were extremely hostile, adversarial, and
acrimonious.  P and U quickly settled P's claims.  U
agreed to pay $4 million to settle the defamation claim
and $2 million plus "back-end" payments to settle the
breach of contract claim.  P was paid the $4 million in
four installments of $1 million in May 1996, November
1996, May 1997, and November 1998.

Even though there was a quick settlement and a public apology by U, P's career as a talent agent was ended by his termination and the negative publicity. Subsequently, P became a talent manager and producer.

P, after consultation with tax professionals, did not include the May 1996, May 1997, or November 1998 payments in income on his tax returns for 1996, 1997, and 1998. P initially included the November 1996 payment in income but later filed an amended return seeking a refund of taxes associated with this payment. P's returns contained detailed statements disclosing P's reasons for excluding the payments from income.

R audited P's 1996, 1997, and 1998 returns. During the audit, P's attorney delayed several times in responding to R. P did not provide certain documents requested by R. P refused to be interviewed by R. R denied P's claim for refund and determined that none of the $4 million paid to settle the defamation claim was excludable from income, and P was liable for a penalty pursuant to sec. 6662, I.R.C., for all years.

Held: P did not cooperate with R. Accordingly, P bears the burden of proof. Sec. 7491(a), I.R.C.; Rule 142(a).

Held, further, pursuant to sec. 104(a)(2), I.R.C., before its amendment by the Small Business Job Protection Act of 1996 (SBJPA), Pub. L. 104-188, sec. 1605, 110 Stat. 1838, the May 1996 payment is excludable from income for 1996.

Held, further, pursuant to sec. 104(a)(2), I.R.C., as amended by the SBJPA, P is not entitled to an overpayment for 1996, and the May 1997 payment and the November 1998 payment are not excludable from income.

Held, further, P is not liable for the penalty pursuant to sec. 6662, I.R.C., for 1996, 1997, and 1998.

Edwin L. Norris, Jonathan M. Brenner, and Ethan D. Millar, for petitioner.

Steven M. Roth, Mark A. Weiner, and Leslie B. Van Der Wal, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, Judge:  Respondent determined the following deficiencies in and penalties on petitioner's Federal income tax:

| Year | Deficiency | Penalty Sec. 6662 |
|------|------------|-------------------|
| 1996 | $407,880 | $81,567 |
| 1997 | 407,880 | 81,567 |
| 1998 | 407,880 | 81,567 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The issues for decision are:  (1) Which party bears the burden of proof; (2) whether four $1 million payments petitioner received from United Talent Agency, Inc. (UTA), in May 1996, November 1996, May 1997, and November 1998 are excludable from petitioner's gross income pursuant to section 104(a)(2); and (3) whether petitioner is liable for the accuracy-related penalty for 1996, 1997, and 1998.

FINDINGS OF FACT[1]

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. At the time he filed the petition, petitioner resided in Beverly Hills, California.

Talent Agencies and Talent Agents

Talent agencies are regulated businesses in the State of California. They procure employment and negotiate deals for their clients. For these services, talent agencies receive a maximum commission of 10 percent. This industry is a very competitive business--every day someone tries to steal someone else's clients. To be a successful talent agent requires an aggressive personality.

Petitioner's Career as a Talent Agent

After graduating from the University of California at Berkeley with a bachelor's degree in film, petitioner became a talent agent. Petitioner signed and represented many young writers for television shows that became "hits". Petitioner primarily represented clients who were in the television industry; however, he also represented clients in the feature

---

[1] We make our findings of fact on the basis of the credible evidence. We note that some of the witnesses were credible with regard to only certain portions of their testimony. The animosity between petitioner and UTA rendered some testimony not credible. Additionally some testimony was conclusory and/or questionable in certain material respects.

film industry. His clients were directors, writers, producers, and actors. Some of petitioner's clients, who numbered over 75, included: Maria Conchita Alonso, Larry David (creator of "Seinfeld"), David Foley, Gregory Hines, David Koepp (whose credits include "Jurassic Park", "Carlito's Way", and "Mission Impossible"), Norm MacDonald, Conan O'Brien, Bronson Pinchot, John Singleton, and several writers from "The Simpsons" and "Seinfeld".

Martin Bauer and Peter Benedek owned the Bauer Benedek Agency (BBA).[2] BBA was a talent agency. In the summer of 1989, after working at International Creative Management (ICM), one of the three largest Hollywood talent agencies,[3] for 4 years, petitioner left ICM and began working at BBA.

Petitioner had offers to work for other agencies but chose BBA. BBA primarily had feature film clients. Petitioner went to BBA to build its television business. Petitioner's initial salary at BBA was $90,000. In 1990, BBA increased his salary to $150,000.

In 1991, Leading Artists Agency (LAA), primarily a television talent agency, merged with BBA to become UTA. James

---

[2] Messrs. Bauer and Benedek were also attorneys.

[3] During the years in issue, the three largest talent agencies in Hollywood, in alphabetical order, were the Creative Artists Agency (CAA), International Creative Management (ICM), and the William Morris Agency (William Morris).

Berkus, a founding partner in LAA, is a talent agent at UTA and the chairman of UTA. Mr. Berkus, an attorney, has been in the entertainment industry for over 25 years.

From 1991 through 1998, with the exception of a short period in 1996, Mr. Bauer was the president of UTA. From sometime in 1996 through 1998, he was a cochairman of UTA. During April 1996, however, Mr. Bauer was not on good terms with the other people involved in the management of UTA.[4]

From its inception until April 21, 1996, petitioner worked as a talent agent for UTA. Petitioner's initial salary at UTA was $150,000.

Since its inception, UTA has grown in the number of its employees and the amount of revenue it has generated. In 1996, UTA was the fourth "most prestigious" talent agency in Hollywood. During 1995 and/or 1996, UTA "packaged" seven shows including "Cybil", "Married...With Children", "The Drew Carey Show", and "Mad About You". During 1996, UTA represented high-profile stars including Sandra Bullock, Jim Carey, Lawrence Kasdan, Martin Lawrence, John Singleton, Jean-Claude Van Damme, and the Coen brothers.

During his employment at UTA, petitioner became "the de facto leader" of the television department--the largest earning

---

[4] Mr. Bauer is no longer associated, and has an adversarial relationship, with UTA. As of the time of trial, he was a talent manager.

department at UTA. By 1996, petitioner was the number one or number two revenue generator at UTA.

Petitioner worked extremely hard. He worked long hours 7 days a week. During the first 6 years of his career, he took a total of only 4 weeks' vacation. Petitioner fought aggressively for his clients. Petitioner was extremely successful in representing his clients.

On January 27, 1992, petitioner and UTA entered into an employment contract (employment agreement). The employment agreement provided petitioner with base compensation of $350,000 per year with a 10-percent annual increase and a discretionary bonus. The employment agreement had a term of 5 years.

The employment agreement provided that UTA could terminate petitioner at any time for "cause". The employment agreement defined "cause" as: (1) A conviction for any felony that was materially injurious to UTA; (2) any breach by petitioner of any of the material terms or covenants of the employment agreement; or (3) any fraudulent, illegal, or immoral activity by petitioner that materially and adversely affected UTA or UTA's reputation. Pursuant to the employment agreement, if UTA terminated petitioner for cause, UTA had no further liability to petitioner except for compensation accrued to the date of termination.

The employment agreement also provided that UTA was not required to use petitioner's services and had the unilateral

right to terminate his employment without cause. In that event, UTA would be required to pay petitioner his base salary, petitioner would not be required to mitigate damages, and petitioner's income from other employment would not reduce the amount owed to him by UTA. In order to terminate petitioner without cause, the elected directors of UTA would have to approve the termination unanimously.

After its execution, the employment agreement was amended several times for various reasons, including to increase petitioner's base salary.

## Wendy Casselith's Accusation of Sexual Harassment

Wendy Casselith was employed by UTA as petitioner's assistant. Around April 1994, Ms. Casselith accused petitioner of verbally abusing and sexually harassing her. She hired an attorney to pursue claims against UTA. UTA resolved Ms. Casselith's claims by paying Ms. Casselith.

## Petitioner Remains at UTA

As of January 1995, petitioner's base salary at UTA was $1 million per year.

On May 1, 1995, UTA and petitioner amended the employment agreement (May 1995 amendment) to extend its term until March 30, 1998, and to increase petitioner's base salary to $2 million per year. The May 1995 amendment also provided that petitioner exchanged his interest in the UTA termination of employment plan

for (1) 25 percent of the commissions received by UTA from package fees or profits (or advances on profits) from petitioner's clients' projects which were booked or being negotiated by UTA while petitioner was at UTA or were payable under the terms of agency agreements signed by petitioner's clients while he was at UTA, and (2) all revenue, not just package fees and profits, on Conan O'Brien's deal for "Late Night With Conan O'Brien" (altogether, the back-end payments).[5] Additionally, petitioner agreed that his bonus would be at UTA's discretion and would be based upon his performance, his attitude, and the performance of UTA. Except as expressly modified therein, the terms of the employment agreement remained in effect.

Petitioner's Relationship With UTA

Petitioner's interaction with UTA's management committee, partners,[6] agents, assistants, and employees often was confrontational. Petitioner was tough on, and demanding of, other agents and assistants. During his employment at UTA, petitioner prided himself in being brash, outspoken, and

---

[5] The May 1995 amendment provides examples including "25% of * * * the commissions received from Larry David's 'Seinfeld' profits".

[6] The witnesses used the words "principals" and "partners" with regard to UTA interchangeably. For convenience, we do so as well. The title "partner" at a talent agency does not necessarily mean that this person has an ownership interest in the agency.

aggressive. Petitioner's persona was eccentric, physically demonstrative, and intense.

During his employment at UTA, petitioner grew dissatisfied with some of UTA's practices. He felt the television department employees were undercompensated, compensation was not based on merit, money was being wasted, and UTA was not run efficiently. Petitioner believed that personal expenses of the partners were inappropriately being claimed as business expenses (such as country club memberships), that improper personal loans were being made to the partners, and that there were problems with drug use.

Petitioner repeatedly disagreed with and challenged the partners and management committee of UTA with respect to the way they ran the agency and regarding compensation. On at least two occasions, petitioner proposed that he either withdraw or be removed as a partner.

Events Leading Up To Petitioner's Termination

In March 1996, when he had 2 years left on his employment contract, petitioner met with UTA's principals to discuss problems petitioner had with how UTA conducted its business. In March 1996, the principals of UTA were Mr. Bauer, Mr. Berkus, Mr. Benedek, Gary Cosay, J.J. Harris, David Schiff, Nick Stevens, Jeremy Zimmer, and petitioner.[7] At that time, UTA's board of

---

[7] Petitioner was not a partner when LAA and BBA merged.

directors and owners were Mr. Bauer, Mr. Berkus, Mr. Benedek, and Mr. Cosay. Although Mr. Harris and Mr. Schiff were partners, they did not have a say in the operation of UTA. During this period, there was infighting between Mr. Bauer and Mr. Berkus that created an acrimonious atmosphere at UTA.

At the March 1996 meeting, UTA offered to raise petitioner's salary to $2.5 million per year; however, UTA wanted petitioner to commit to 5 years with UTA. At this time, UTA was having problems making deals and re-signing junior agents. Petitioner felt that no one at UTA wanted to address the problems petitioner had with UTA. Petitioner stated that he would not agree to the offer, he would finish his contract, and then he would leave UTA. Petitioner believed that the other partners were frightened that petitioner's clients would leave with him.

Nancy Jones's Accusation of Sexual Harassment

During early 1996, Nancy Jones was a talent agent at UTA. Petitioner helped hire Ms. Jones. She worked with petitioner in the television department for many years. Although petitioner did not describe his relationship with Ms. Jones as a "romantic relationship", at one point he and Ms. Jones had a "personal and sexual relationship". They went on vacation together to Mexico and traveled together outside the office.

In early 1996, petitioner talked with Ms. Jones about her performance. He felt that she was not working hard, she was embarrassing clients, and she had claimed to be sick when she

actually took a vacation to New York City. Ms. Jones suggested that she should be let out of her contract even though she had several years left on it. At this time, Ms. Jones was seeking to leave UTA and join CAA.

In or about April 1996, Ms. Jones made accusations to Mr. Benedek that petitioner was sexually harassing and abusing her. Although she did not demand monetary compensation, she demanded to be released from her written employment agreement or she would make her claims public.

UTA, over Mr. Bauer's objection, released Ms. Jones from her contract in exchange for her releasing UTA from her sexual harassment claims. Ms. Jones left UTA and joined CAA. Ms. Jones later stated that she never intended to file a complaint against UTA.

## Petitioner's Termination

On or about Sunday, April 21, 1996, a meeting was held at Mr. Zimmer's home to discuss terminating petitioner's employment (April 21 meeting). Mr. Benedek, Mr. Berkus, Mr. Cosay, Mr. Stevens, and Mr. Zimmer attended the April 21 meeting. Mr. Bauer was not invited. Everyone attending the April 21 meeting participated in the discussion about what to do to petitioner. The April 21 meeting lasted approximately 1 hour, and at the end of the April 21 meeting, all present agreed to terminate petitioner's employment.

Although it was not UTA's practice to terminate an employee on a Sunday or without notice, on Sunday, April 21, 1996, UTA terminated petitioner's employment. Mr. Bauer was the only board member not informed of the meeting, and he did not give his consent to terminate petitioner without cause. Mr. Bauer felt betrayed and treated with a lack of respect by the actions of the other partners present at the April 21 meeting. Mr. Zimmer later told Mr. Bauer to look at the bright side of the firing: they could go after petitioner's clients together. In the end, however, most of petitioner's clients left UTA.

Events Following UTA's Decision To Terminate Petitioner

Immediately after deciding to terminate petitioner, UTA contacted the media so that they would hear from UTA about petitioner's termination and not from petitioner or someone else. It was not UTA's general practice to contact the media to announce the termination of an agent.

That same day, Mr. Stevens called petitioner at home and informed him that he was fired for cause on account of his inappropriate behavior towards Ms. Jones. It is unclear, however, whether Mr. Stevens called petitioner before or after calling the news media. Petitioner was shaken, upset, and fearful about his future after learning he had been fired.

Since petitioner knew he needed an attorney, he called an old friend from high school, Brad Berenson, who was an attorney at Sidley Austin Brown & Wood (Sidley Austin) in Washington, D.C.

Petitioner explained to Mr. Berenson what had happened, and Mr. Berenson told petitioner that he would call Sidley Austin's Los Angeles office and get back to petitioner.

Mr. Berenson called petitioner back and gave him the name of Peter I. Ostroff, who was the head of the litigation group at Sidley Austin in Los Angeles, California. On April 21, 1996, petitioner engaged Sidley Austin to represent him.

Among the other individuals petitioner called on April 21, 1996, after being informed of his termination, was Bill Block, president of ICM. Mr. Block had previously expressed an interest in retaining petitioner's services. Mr. Block said he was going to have to call petitioner back after discussing matters with his other partners at a company retreat that was being held on Monday, April 22, 1996, at the Four Seasons in Santa Barbara, California (ICM retreat).

Late in the day on April 21, 1996, petitioner went to UTA's offices to collect his personal effects. A guard was posted at UTA's offices. Usually, there was no guard. Petitioner's electronic key no longer worked. The guard asked petitioner for petitioner's driver's license. Petitioner showed the guard his license, and the guard informed petitioner he was not allowed in. Petitioner called Mr. Berkus in the hope that he would be allowed to enter the office and retrieve his belongings, but Mr. Berkus would not come to the phone.

On April 22 and 23, 1996, Daily Variety, the Hollywood Reporter, and the Los Angeles Times published articles regarding petitioner's termination.[8]  UTA's termination of petitioner was also reported on KTLA Channel 5 and KNX News Radio.

The front page of the Monday, April 22, 1996, edition of Daily Variety had the banner headline "UTA ZAPS POLONE".  Beneath the banner headline was the phrase "Agency cites behavior; agent denies charge".  The article included the following statements:

> United Talent Agency's Gavin Polone * * * was abruptly fired from UTA Sunday over what agency partners referred to as "inappropriate" behavior toward fellow TV agent Nancy Jones, who resigned Wednesday.
>
> *       *       *       *       *       *       *
>
> "We have terminated his employment," UTA partner Jim Berkus told Daily Variety on Sunday.  "The decision was ours.  We called today (Sunday) and told him.  We felt the way he accorded himself with colleagues and
>
> employees was inappropriate.  His behavior toward (fellow TV agent) Nancy Jones was of significant concern to us."
>
> *       *       *       *       *       *       *
>
> Polone was ordered to attend a counseling session with an attorney who specialized in behavioral problems.

---

[8]  Daily Variety and the Hollywood Reporter are widely read each business day by people in the entertainment industry.  The Los Angeles Times is a newspaper of general circulation in Southern California.  In April 1996, the daily paid circulation of these papers was as follows:  (1) Daily Variety, over 25,000 people, (2) the Hollywood Reporter, over 20,000 people, and (3) the Los Angeles Times, over 1 million people.

UTA however had not hired an attorney who specialized in behavioral problems to counsel petitioner. Furthermore, petitioner had not been ordered to seek counseling from such an attorney or other professional.

The Monday, April 22, 1996, edition of the Hollywood Reporter also contained an article about petitioner's termination. The article included the following statements:

> Reached Sunday, a spokesman for the agency would only comment "We have terminated Gavin Polone's employment at United Talent Agency for reasons that his philosophy on inter-personal relationships and ours are antithetical * * * ."

>     *      *      *      *      *      *      *

> * * * sources inside the agency said the move was triggered late in the week after another employee, TV agent Nancy Jones, approached management and asked to be released from her contract because of Polone's allegedly inappropriate behavior toward her.

The Tuesday, April 23, 1996, edition of the Los Angeles Times reported that "One allegation from UTA is that Polone was abusive toward Nancy Jones, an agent there who worked under him."

The Tuesday, April 23, 1996, edition of Daily Variety again reported: "Agency partners said the cause for the firing was Polone's 'inappropriate' behavior toward fellow TV agent Nancy Jones, who resigned Wednesday" and "partner Jim Berkus said on Sunday: 'We felt the way he accorded himself with colleagues and employees was inappropriate. His behavior toward Nancy Jones was of significant concern to us.'"

Petitioner started receiving calls from journalists asking for comments. Petitioner believed that the statements in the articles attributed to UTA were false and that UTA had no cause to fire him. Petitioner told the journalists that none of the statements were true.

Petitioner's Prospects With ICM

On Monday, April 22, 1996, the ICM retreat was attended by the executives of ICM and approximately 80 agents (including personnel from ICM's London office). Jeff Berg, the chairman or CEO of ICM, was at the ICM retreat. The articles about petitioner that appeared in the trade publications that morning were brought to the ICM retreat. At the ICM retreat, Mr. Berg spoke to those in attendance and, referring to petitioner, stated: "This is the poster boy for bad behavior" and "This kind of behavior will not be tolerated at ICM". Mr. Berg had the articles about petitioner in his hand when he made these statements.

Toni Howard, a senior vice president in the motion picture department of ICM, attended the ICM retreat. When Ms. Howard learned that ICM was in discussions to hire petitioner, she opposed hiring petitioner. She spoke to six executives at ICM and questioned how ICM could hire petitioner after noting the articles in the trade publications.

Eventually, petitioner met with ICM. ICM would not hire him, in part because of the articles in the trade publications.

Petitioner's 1996 Litigation Against UTA

On Monday, April 22, 1996, petitioner met with Mr. Ostroff to discuss his legal claims against UTA. Mr. Ostroff prepared a draft complaint that alleged the following claims against UTA: Defamation, intentional infliction of emotional distress, intentional interference with prospective economic advantage, invasion of privacy, wrongful termination, and breach of contract (the complaint). Petitioner's primary concern was to "clear his name". He wanted UTA to retract what UTA had said and to apologize. Petitioner and Mr. Ostroff wanted to resolve petitioner's claims against UTA as quickly as possible in order to mitigate the damages to petitioner's reputation. Petitioner was also concerned that UTA had the resources to make litigation of these claims very expensive, that litigation would tie up his life and ruin any chance he had of starting a new career, and that UTA might fabricate more (and worse) stories about him.

That same day, Mr. Ostroff sent a letter to UTA that, among other things, asserted legal claims against UTA based on UTA's alleged unlawful and tortious actions and demanded that (1) UTA cease and desist from making further defamatory statements regarding petitioner, (2) UTA allow petitioner access to his personal files, and (3) UTA pay petitioner all of his earned but unpaid wages. Mr. Ostroff also proposed a meeting by the afternoon of Tuesday, April 23, 1996. Petitioner hoped that UTA would admit that UTA had made a "massive mistake" and apologize.

Settlement Negotiations

On Tuesday, April 23, 1996, a meeting was held at the office of UTA's attorneys, O'Melveny & Myers, in Los Angeles, California (April 23 meeting). Petitioner, Mr. Ostroff, Lori Dillman (another attorney for petitioner from Sidley Austin), Mr. Berkus, Mr. Benedek, and Scott Dunham of O'Melveny & Myers attended the April 23 meeting. Mr. Dunham, Healy Condon, and David Wyle represented UTA in the April 1996 dispute with petitioner.[9] The atmosphere and the negotiations at the April 23 meeting were hostile, adversarial, and acrimonious.

At the April 23 meeting, Mr. Ostroff summarized the elements of the complaint. The complaint included the following allegations:[10]

> 15. Over the course of his employment with UTA and his service on the Management Committee, and especially in the last six months of his employment with UTA, Plaintiff became aware of and concerned by a number of improper and/or illegal acts and practices

[9] Although the record is somewhat unclear, it appears that the dispute in April 1996 was not the only dispute, or threatened/actual litigation, between petitioner and UTA. Apparently, sometime after the settlement of the defamation and breach of contract claims was reached, petitioner allegedly violated the confidentiality provisions of the settlement agreements. When Mr. Bauer was informed that petitioner was allegedly violating the confidentiality provisions of the settlement agreements and speaking to the Internal Revenue Service regarding UTA's principals, he instructed UTA's attorneys to initiate a lawsuit against petitioner for, among other things, breach of the settlement agreements and misappropriation of trade secrets.

[10] The redactions noted are contained in the copy of the complaint submitted to the Court.

occurring within UTA, which were undertaken by or with the authorization and ratification of, defendants BENEDEK, BERKUS, STEVENS, ZIMMER, and COSAY.  Over a period of several months, Plaintiff made known to defendants BENEDEK, BERKUS, STEVENS, ZIMMER, and COSAY Plaintiff's concerns that these acts and practices were wrongful and/or illegal and could expose UTA to liability, condemnation within the industry, loss of clients, and general damage and harm.  * * * The acts and practices about which Plaintiff complained included, but were not limited to, the following:

A.   The defrauding of UTA clients through misrepresentation that commission rates were in most instances non-negotiable at 10% and uniform for all clients, while in truth, UTA agreed to special reduced commission deals with selected and favored clients;

* * * * * * *

D.   Illegally recording, as phony "loans" that were interest-free and never intended to be paid back to UTA, payments made by UTA to [names redacted] to cover country club fees, among other things, so as to disguise income to said persons for tax purposes; and

E.   Condoning and tolerating illegal use of controlled substances by UTA employees * * * and by one member of the [redacted] who participated in the illegal use of drugs with other employees of UTA at a company retreat.

16.   In response to Plaintiff's complaints about their improper and illegal conduct, defendants BENEDEK, BERKUS, STEVENS, ZIMMER, and COSAY failed to put a stop to the conduct and, in fact, gave every indication that the conduct would continue.

* * * * * * *

21.   * * * the conduct [of Mr. Polone] alleged [by UTA] was not at variance with and in no instances worse than the standards of conduct tolerated at UTA by defendants in view of the fact that defendants had themselves routinely committed sexual, for example, misconduct in connection with their employment, including sexual liaisons between [name redacted] and various subordinate employees of UTA, and unwelcome

sexual pursuit of a client of the firm by [name
redacted].

Some of the redacted portions of the complaint contained accusations that Mr. Benedek had sexually harassed UTA clients.

Mr. Ostroff also advised UTA that petitioner would file the complaint unless a settlement could be reached quickly. Mr. Ostroff informed UTA that he thought petitioner's claims against UTA totaled approximately $20 million. Mr. Ostroff estimated the contract damages to be worth approximately $8 million and the tort damages, because of the egregious nature of and publicity surrounding petitioner's termination, to be worth approximately $12 million. Petitioner was serious about prosecuting the complaint in the event a settlement was not reached with UTA.

Mr. Berkus felt that petitioner's attorneys were being aggressive and that petitioner's monetary demand was absurd. Mr. Berkus scoffed at, and was derisive of, petitioner's settlement offer. He felt that petitioner was attempting to extort money from UTA.

Mr. Dunham spoke for UTA at the April 23 meeting. He indicated that UTA had the right to fire petitioner without cause and would owe petitioner only $4 million if he was fired without cause. UTA's initial offer was between $2 million and $3 million. UTA adamantly defended its actions.

No agreement was reached between petitioner and UTA at the April 23 meeting. At the time, Ms. Dillman thought that the

complaint was going to be filed, and no agreement would be reached.

That evening, petitioner spoke to Mr. Bauer. After speaking to Mr. Bauer, petitioner felt he had a stronger case against UTA. Mr. Bauer told petitioner that he was never consulted about firing petitioner, nothing about the situation was handled appropriately, UTA had defamed petitioner, he was considering suing UTA as well, and he believed that petitioner had not harassed Ms. Jones.

Negotiations continued after the April 23 meeting. Mr. Dunham indicated that UTA wanted to resolve the matter and gave Mr. Ostroff and Sidley Austin permission to speak directly to Mr. Berkus. Mr. Dunham felt comfortable with Mr. Berkus's ability to negotiate a deal with petitioner's attorneys. Mr. Berkus's business was the negotiation of deals, and the issue to be negotiated was financial (i.e., how much to pay petitioner for each cause of action).

Mr. Berkus negotiated directly with Mr. Ostroff and Ms. Dillman. Petitioner made a counterproposal of $9.25 million, and UTA countered with $4 million. These monetary demands were accompanied by additional terms. Petitioner wanted Jay Sures (an agent at UTA) released from his contract, an apology and retraction, the ability to compete with UTA, vacation pay, and his personal effects that were still in UTA's offices. UTA wanted a noncompete agreement, a nonsolicitation agreement, and a

release from the defamation claim. Each side demanded terms that the other rejected.

## Settlement Reached

On Wednesday, April 24, 1996, only days after petitioner's discharge, petitioner and UTA reached an agreement. UTA agreed to pay petitioner $4 million to settle the defamation claim and $2 million plus the back-end payments to settle the breach of contract claim.[11] Petitioner wanted payment up front; however, UTA would not agree to an up-front payment.

At the time of the settlement, the back-end payments were estimated to be worth approximately $2 million. As of the time of trial, petitioner had received significantly more than $2 million in back-end payments, and the back-end payments were continuing to be made to petitioner.

That same day, Ms. Dillman faxed a letter to UTA regarding the settlement reached between petitioner and UTA (April 24, 1996, letter). Also on that day, Mr. Berkus made handwritten

---

[11] The agreement also consisted of many other monetary and nonmonetary aspects. These included a confidentiality provision, petitioner's right to audit UTA, UTA's reimbursement of unpaid expenses petitioner incurred for UTA, UTA's provision of health insurance to petitioner, UTA's payment of petitioner's accrued vacation days, UTA's payment of all petitioner's legal fees incurred in connection with "this dispute", petitioner's refraining from interfering with collection of accounts receivable from petitioner's clients, petitioner's refraining from disclosing UTA trade secrets, petitioner's ability to compete against UTA, and the exchange of mutual and general releases.

notations on the April 24, 1996, letter, signed it, and faxed it back to petitioner's counsel. The terms contained in the April 24, 1996, letter included a provision whereby UTA would pay petitioner a total of $6 million in several installments, and petitioner would also be entitled to the back-end payments.

Before he signed the April 24, 1996, letter, Mr. Berkus spoke with Mr. Bauer, Mr. Benedek, Mr. Cosay, Mr. Stevens, and Mr. Zimmer. The decision to settle was a group decision by UTA's management--all knew about the agreement and agreed with the obligation UTA was assuming. Mr. Berkus sensed that petitioner was extremely close to filing the complaint when he signed the April 24 letter. Mr. Berkus took very seriously petitioner's threats to file the complaint.

On Wednesday, April 24, 1996, UTA issued the following press release, as was required by the agreement reached on April 24, 1996:

> Upon further investigation, we have determined that there were insufficient grounds to terminate Gavin Polone's employment for cause. We regret any misconception created as a result of the reporting of these events in the media. We have reached an amicable settlement with Gavin Polone and wish him well in his future endeavors.

The entire press release was reported in the Hollywood Reporter in its Thursday, April 25, 1996, edition under the headline "UTA apologizes, pays off Polone". The first two

sentences of the press release were reported by Daily Variety in its April 25, 1996, edition.[12]

Documenting the Settlement

After UTA and petitioner reached the settlement on Wednesday, April 24, 1996, Mr. Dunham was involved in the drafting of the final documents. On Friday, April 26, 1996, Mr. Dunham delivered to Mr. Ostroff a draft of a comprehensive settlement and general release agreement with respect to petitioner's claims against UTA.

Mr. Ostroff and Ms. Dillman asked Gary Cohen, a tax attorney at Sidley Austin, to document the settlement reached between petitioner and UTA. Mr. Cohen proposed the use of two settlement agreements to Mr. Dunham. Mr. Cohen believed that two documents, rather than one, were advisable from a tax perspective. He felt that the employment claim and defamation claim should be kept separate. On April 29, 1996, Mr. Cohen sent Mr. Dunham drafts of two settlement agreements with respect to petitioner's claims against UTA (two settlement agreements).

On May 1, 1996, Mr. Cohen sent Mr. Dunham revised pages of the two settlement agreements that were blacklined to show corrections made by Mr. Dunham to the versions sent to him on April 29, 1996.

---

[12] The article immediately to the right of the article on UTA and petitioner's settlement (on the front page) reported that Ms. Jones had joined CAA.

That same day Ms. Dillman also sent a separate letter to Mr. Berkus and Mr. Dunham.  The letter was sent at Mr. Berkus's and Mr. Dunham's request to confirm that the April 24, 1996, letter, as countersigned and slightly amended by Mr. Berkus, represented a binding settlement agreement.

On May 2, 1996, Mr. Dunham delivered to Mr. Ostroff revised drafts of the two settlement agreements, both in unmarked and redlined versions, with changes from the versions sent to Mr. Dunham on May 1, 1996.  Mr. Dunham made changes to eliminate language he thought was unnecessary, not part of the agreement reached between UTA and petitioner (i.e., inconsistent with the agreement that was detailed in the April 24, 1996, letter), overbroad, and/or redundant.

On May 3, 1996, Mr. Dunham faxed Mr. Cohen and Mr. Ostroff further revised drafts of the two settlement agreements.  That same day, petitioner and UTA executed two agreements--the Employment Termination Agreement and Mutual General Release (employment termination agreement) and the Defamation Agreement and Mutual General Release (defamation agreement).

The employment termination agreement provided UTA would pay petitioner $2 million in five installments ($475,000 by June 30, 1996, and December 31, 1996, and $350,000 by June 30, 1997, December 31, 1997, and January 1, 1998) and the back-end payments received after March 31, 1998.

The defamation agreement provided UTA would pay petitioner $4 million in four $1 million installments. The first payment was to be made on May 1, 1996.[13] The last three payments were to be made by November 1, 1996, May 1, 1997, and November 1, 1997. The defamation agreement specifically provided that these payments would be paid to petitioner as compensation to him for the alleged personal injuries he suffered on account of the defamation. UTA entered into the defamation agreement, and agreed to pay petitioner $4 million pursuant to the defamation agreement, in order to settle petitioner's defamation claim. UTA would not have agreed to settle with petitioner if petitioner had not agreed to release UTA from his defamation and other legal claims.

## Petitioner's Career After His Termination By UTA

Before his termination by UTA, petitioner was a top-earning talent agent at UTA, had numerous well-known and prestigious clients, was considered a "partner" at UTA, and was considered very successful within the entertainment industry. After being fired by UTA, petitioner did not receive any calls from CAA or William Morris. ICM specifically would not hire petitioner because of the concern expressed by some of ICM's partners regarding the adverse publicity surrounding petitioner's dismissal from UTA.

---

[13] We note that this payment was due 2 days before the execution of the defamation agreement.

After his termination and the conclusion of the settlement negotiations, petitioner felt he had no viable career as a talent agent. He also did not believe he could start his own talent agency. Petitioner thus decided to pursue a career as a talent manager and as a film and television producer. Talent managers are not allowed to procure employment on behalf of clients and do not benefit from the fixed commission rates that talent agents are entitled to receive under their agreements with the talent guilds.

Around May 1996, he started Hofflund Polone with Judy Hofflund (a former partner at UTA). During 2001 or 2002, petitioner formed a production company named Pariah Productions.

As of the time of trial, petitioner had at least two television shows on the air--Family Affair and Hack. Several pilots he produced had not yet been picked up as series, and he had not produced any feature films.

Payments Made to Petitioner Pursuant to the Settlement Agreements

Pursuant to the employment termination agreement, UTA paid petitioner $950,000 in 1996 and $1,050,000 in 1998. Petitioner included these amounts on his respective Federal income tax returns for 1996 and 1998.

Pursuant to the defamation agreement, UTA paid petitioner $1 million on or about: (1) May 1, 1996 (May 1996 payment), (2) November 11, 1996 (November 1996 payment), (3) May 5, 1997 (May

1997 payment), and (4) November 11, 1998 (November 1998 payment).[14]

UTA did not withhold any taxes from the $4 million it paid petitioner pursuant to the defamation agreement (i.e., with respect to petitioner's defamation claim). Petitioner never attempted to sell his anticipated stream of income from the settlement.

Petitioner's Tax Returns

In April and May 1996, petitioner consulted with tax accountants and tax attorneys to discuss the state of the tax law as it related to the settlement with UTA. Petitioner was told that the $4 million allocated to the defamation claim would be nontaxable.

Petitioner advised his business manager, from the firm of Kessler Schneider, to disclose the settlement with UTA on his tax returns in the most clear and proper way possible. Petitioner's business manager prepared petitioner's tax returns in consultation with petitioner's tax attorneys.

On his Federal income tax returns for 1992 through 1996, petitioner reported the following total salary and bonus received from UTA: $450,000 in 1992, $954,000 in 1993, $1,190,229 in 1994, $1,956,408 in 1995, and $1,768,681 in 1996.

---

[14] Sometime after the settlement was executed, UTA ceased making payments provided for in the settlement agreement. A lawsuit ensued, and payments eventually resumed.

Hofflund Polone, a partnership, allocated to petitioner or petitioner's wholly owned corporation the following taxable income: $84,416 in 1996, $1,300,423 in 1997, $1,624,867 in 1998, $1,684,024 in 1999, $2,395,145 in 2000, and $2,377,146 in 2001.

On or about October 10, 1997, petitioner filed his 1996 Federal income tax return. Petitioner did not include the May 1996 payment in income on his 1996 return. Petitioner reported, under other income on his 1996 return, a $1 million payment from UTA on his 1996 return. This amount, which represented the November 1996 payment, was in addition to the wages he reported from UTA in 1996. Statement 1 of petitioner's 1996 return stated: "Taxpayer received $1 million from United Talent Agency (UTA), representing settlement of claims by taxpayer for personal injury against UTA, pursuant to an agreement as of May 1, 1996. The lump-sum payment received does not constitute income subject to self-employment tax."

On his 1997 return, petitioner reported, under other income, $2,000. Petitioner did not include the May 1997 payment in income. On the line for other income "See Statement 1" was typed in. Statement 1 of petitioner's 1997 return listed $2,000 from Conde Nast Publications and $1 million from UTA as "miscellaneous income" and subtracted out $1 million as UTA settlement proceeds to arrive at a total of $2,000. Below the subtraction were the words "see footnote". The footnote, contained in statement 2, stated:

Taxpayer settled a lawsuit with his prior employer for defamation on May 1, 1996, by entering into a settlement agreement. In the settlement agreement, the taxpayer released his former employer from any liability related to his claims for defamation and, in exchange, received $4 million. This $4 million was comprised of the former employer's promise to pay $1 million at the time the settlement agreement was executed, $1 million in November 1996, $1 million in May 1997 and $1 million in November 1997.

During the tax year 1997, the taxpayer received the lawsuit settlement installment in May 1997. The former employer failed to make payment in November 1997.

Under "Warren Jones v. Commissioner," 524 F. 2nd 788 (9th Cir. 1975), rev'g 60 T.C. 663 (1973), and "Heller Trust v. Commissioner," 382 F.2nd 675 (9th Cir. 1967), the taxpayer is required to treat his receipt of his former employer's promise to pay $4 million as an amount realized in the 1996 taxable year at the time of his receipt of the promise to pay, in May 1996. Under IRC section 104, amounts received in May 1996 on account of claims for defamation and other tort type rights were excludable from gross income. (Reg. sec. 1.104-1(c)).

Accordingly, the taxpayer's receipt of his former employer's promise to pay was excludable from gross income.

Petitioner's 1997 return also included a Form 8275, Disclosure Statement. The disclosure statement cross-referenced the above footnote.

On his 1998 return, petitioner reported his other income in substantially the same manner as it was reported on his 1997 return--i.e., petitioner did not include the November 1998 payment in income and included a statement and a footnote similar to those on his 1997 return. The footnote on the 1998 return also noted that petitioner received the payment he was supposed to receive in November 1997 in November 1998. Petitioner's 1998

return also included a Form 8275.  The disclosure statement cross-referenced the footnote in Statement 2.

On or about April 16, 1998, petitioner filed an amended 1996 Federal income tax return.  On the amended return, among other things, petitioner decreased his adjusted gross income by $1 million.  Essentially, petitioner sought to exclude the November 1996 payment from income and sought a refund of Federal income taxes paid with respect to the November 1996 payment. Petitioner's amended return also included a Form 8275.  The disclosure statement referred to an attached explanation.  The explanation was substantially similar to paragraphs 1 and 3 of the footnote contained in his 1997 return.  The explanation also stated:  "The taxpayer's original 1996 Form 1040, however, erroneously reported $1 million of the amounts received under the settlement agreement as income.  As a result, taxpayer is now filing this amended return to correct the error in his original return."

Examination of Petitioner's 1996, 1997, and 1998 Tax Returns

Revenue Agent Marcelle Colline (RA Colline) conducted the examination of petitioner's 1996, 1997, and 1998 returns.  RA Colline has worked at the Internal Revenue Service (IRS) for approximately 20 years.  During most of that time, she has been a revenue agent.  In 2001, she was promoted to manager.

John Alan Harbin represented petitioner during the examination of petitioner's 1996, 1997, and 1998 returns. Mr. Harbin is an attorney and a certified public accountant.

RA Colline met with Mr. Harbin several times during the examination. RA Colline issued several Information Document Requests (IDR) to petitioner. Mr. Harbin was professional, but he delayed several times in responding to the IRS.

RA Colline requested that petitioner sign a Form 12180, Third Party Authorization. RA Colline requested permission to interview a third party--Mr. Berkus. Mr. Harbin stated that he would sign the Form 12180; however, over a month passed and he never signed the form. RA Colline summoned Mr. Berkus and interviewed him.

On July 26, 1999, RA Colline issued an IDR (July 26 IDR) to petitioner. She received none of the requested documents. All three items requested concerned the settlement documents for the litigation between petitioner and UTA regarding UTA's termination of petitioner. RA Colline did not obtain the information requested in the July 26 IDR from petitioner. In October 1999, she obtained this information from Mr. Berkus.

On November 8, 1999, RA Colline issued an IDR (November 8 IDR) to petitioner.[15] The November 8 IDR requested tax return information regarding petitioner from Hofflund Polone and Bedford

---

[15] This document also informed petitioner that his 1997 and 1998 tax years were under examination.

Falls Investors, L.P.,[16] for 1996, 1997, and 1998.  RA Colline did not receive any information regarding Hofflund Polone from petitioner, and Mr. Harbin provided information only for 1998 regarding Bedford Falls Investors, L.P.

In the November 8 IDR, RA Colline also requested copies of petitioner's 1997 and 1998 income tax returns.  Mr. Harbin eventually sent petitioner's 1998 return after RA Colline advised him that she had obtained copies of petitioner's 1997 return.

During the examination, RA Colline requested an interview with petitioner to gather information about, and petitioner's explanation of, items on petitioner's returns that were under examination.  Mr. Harbin absolutely refused to allow petitioner to be interviewed.  Petitioner testified for over 4-1/2 hours during the trial of this case.

Respondent's Determination and Denial of Petitioner's
Refund Claim

On or about February 15, 2000, respondent denied petitioner's claim for refund for 1996 (relating to the November 1996 payment).  The reason for disallowance was that the $1 million payment associated with petitioner's refund request did not qualify as tax-free income.

In the notice of deficiency, respondent determined that the May 1996 payment, the May 1997 payment, and the November 1998

---

[16]  Bedford Falls Investors, L.P., was listed as a partnership petitioner received income or loss from on Schedule D of his 1996, 1997, and 1998 returns.

payment were includable in petitioner's taxable income for 1996, 1997, and 1998, respectively.[17] Respondent also determined a penalty pursuant to section 6662 for all 3 years.

Refund Litigation

On February 14, 2002, petitioner filed a complaint in U.S. District Court seeking a refund of the Federal income taxes attributable to his including the November 1996 payment in income on his 1996 return.

OPINION

I.  Burden of Proof

The parties vigorously dispute who bears the burden of proof. Section 7491(a) places the burden of proof on the Commissioner with regard to certain factual issues if certain conditions are met. Higbee v. Commissioner, 116 T.C. 438, 440 (2001). Section 7491 applies to examinations commenced after July 22, 1998. Id. Respondent concedes that the examination of petitioner's 1996, 1997, and 1998 tax years began after the effective date of section 7491.

Section 7491(a)(2) provides that the Commissioner will bear the burden of proof with respect to an issue pursuant to section 7491(a) if:

(A) the taxpayer has complied with the requirements under this title to substantiate any item;

---

[17] Respondent also reduced petitioner's itemized deductions for 1996, 1997, and 1998 because of the increase in petitioner's income. This adjustment is purely computational.

(B) the taxpayer had maintained all records required under this title and has cooperated with reasonable requests by the Secretary for witnesses, information, documents, meetings, and interviews; and

(C) in the case of a partnership, corporation, or trust, the taxpayer is described in section 7430(c)(4)(A)(ii).

The burden is on the taxpayer to show that he satisfied these prerequisites. H. Conf. Rept. 105-599, at 240, 242 (1998), 1998-3 C.B. 747, 994, 996.

Respondent contends, among other things, that petitioner did not cooperate with respondent's reasonable requests for information, documents, and interviews; therefore, the burden of proof does not shift to respondent. Respondent's IDRs and request to interview petitioner were requests for information, documents, and an interview. Thus, we must decide whether respondent's requests were reasonable and whether petitioner failed to cooperate.

A. Reasonable Request

We consider all the surrounding facts and circumstances of this case in deciding whether respondent's request for witnesses, information, documents, meetings, and interviews is reasonable. Respondent requested information concerning the settlement documents regarding UTA's termination of petitioner and regarding petitioner's tax return information for the years in issue. This information was relevant to the determination of the taxable amount of the May 1996 payment, the November 1996 payment, the

May 1997 payment, and the November 1998 payment, and to the bottom line amount of taxable income petitioner had during the years in issue.  Respondent requested an interview with petitioner to gather information about, and petitioner's explanation of, items on petitioner's returns that were being examined.  On the basis of the facts and circumstances, we hold that respondent's requests in the July 26th IDR, in the November 8th IDR, and to interview petitioner were reasonable requests for information, documents, and interviews.

B.   Cooperation

Whether the taxpayer cooperated with reasonable requests by the Commissioner for witnesses, information, documents, meetings, and interviews is based on all the surrounding facts and circumstances of the case.  The statute itself does not state what constitutes "cooperation".  The conference committees's report states that the House bill provided:

> [T]he taxpayer must fully cooperate at all times with the Secretary (including providing, within a reasonable period of time, access to and inspection of all witnesses, information, and documents within the control of the taxpayer, as reasonably requested by the Secretary).  Full cooperation also includes providing reasonable assistance to the Secretary in obtaining access to an inspection of witnesses, information, or documents not within the control of the taxpayer (including any witnesses, information, or documents located in foreign countries).  A necessary element of fully cooperating with the Secretary is that the taxpayer must exhaust his or her administrative remedies (including any appeal rights provided by the IRS).  The taxpayer is not required to agree to extend the statute of limitations to be considered to have fully cooperated with the Secretary.  [H. Conf. Rept

105-599, <u>supra</u> at 239, 1998-3 C.B. at 993; fn. refs. omitted; emphasis added.]

The conference committees's report further states that the Senate amendment provided:

> [T]he taxpayer must <u>cooperate with reasonable requests by the Secretary for meetings, interviews, witnesses, information, and documents</u> (including providing, within a reasonable period of time, access to and inspection of all witnesses, information, and documents within the control of the taxpayer, as reasonably requested by the Secretary). <u>Cooperation</u> also includes providing reasonable assistance to the Secretary in obtaining access to an inspection of witnesses, information, or documents not within the control of the taxpayer (including any witnesses, information, or documents located in foreign countries). A necessary element of <u>cooperating</u> with the Secretary is that the taxpayer must exhaust his or her administrative remedies (including any appeal rights provided by the IRS). The taxpayer is not required to agree to extend the statute of limitations to be considered to have <u>cooperated</u> with the Secretary. <u>Cooperation</u> also means that the taxpayer must establish the applicability of any privilege. * * * [<u>Id.</u> at 240, 1998-3 C.B. at 994; fn. refs. omitted; emphasis added.]

Thus, the Senate Amendment changed "full cooperation" to "cooperation", "fully cooperate" to "cooperate", and "fully cooperate at all times with the Secretary" to "cooperate with reasonable requests by the Secretary for meetings, interviews, witnesses, information, and documents". The conference agreement followed the Senate Amendment except for some changes not relevant to the definition of cooperation.

Petitioner failed to provide documents within his control requested in the July 26 IDR and November 8 IDR. Petitioner argues that because the documents contained in the July 26 IDR

were publicly available (i.e., at a courthouse) and from UTA (the opposing party in the dispute involving petitioner's termination), and because respondent eventually received some of these documents from Mr. Berkus, albeit several months later, the fact that petitioner did not provide this information to respondent does not mean petitioner was uncooperative. Petitioner also argues that, because petitioner's 1997 return was available from the service center, the fact that petitioner did not provide his 1997 return to respondent does not indicate that petitioner was uncooperative. We disagree.

The fact that respondent could obtain documents and/or information from another source, and/or did eventually obtain the documents and/or information from another source, does not relieve petitioner from his obligation to cooperate if petitioner desires the benefit of the provisions of section 7491(a).[18] If this were not the case, taxpayers could be affirmatively uncooperative but still gain the benefit of section 7491(a) so long as the Commissioner was able to obtain the information that he sought.

Mr. Harbin's conclusory statements that he was cooperative on behalf of Mr. Polone are unpersuasive. Mr. Harbin stated that in cases involving celebrities, it is his business practice to

---

[18] We note that it takes the Commissioner between 6 and 8 weeks to obtain return information from his internal recordkeeping centers. Additionally, the information contained on a transcript of account is not as clear as the actual return.

decline interviews with the taxpayer.  The fact that Mr. Harbin
thought petitioner was "world famous" in Hollywood does not
entitle petitioner to preferential treatment when it comes to
section 7491(a)--petitioner still needed to cooperate with
respondent in order to secure the benefits of section 7491(a).[19]

Petitioner's actions impeded respondent's examination of
petitioner's 1996, 1997, and 1998 returns.  Petitioner, by
failing to provide respondent with the information and documents
requested in the July 26 IDR and in the November 8 IDR, and by
refusing to be interviewed, did not provide respondent with
reasonable assistance in obtaining access to witnesses,
documents, and/or information.  On the basis of the facts and
circumstances of this case, we hold that petitioner failed to
cooperate with respondent's reasonable request for information,
documents, and interviews.  Accordingly, petitioner bears the
burden of proof.[20]  Sec. 7491(a); Rule 142(a).

---

[19]  Petitioner argues that the legislative history of sec.
7491 demonstrates that the intent of the section is only to
require sharing documents and other information with respondent.
We disagree.  The legislative history specifically mentions
cooperating with requests for interviews and access to all
witnesses.  H. Conf. Rept. 105-599, at 240 (1998), 1998-3 C.B.
747, 994.  More importantly, the statute specifically provides
that the taxpayer has to cooperate with reasonable requests for
interviews.  Sec. 7491(a)(2)(B).

[20]  We note it appears that petitioner did not exhaust his
administrative remedies.  This is an alternative reason to hold
that the burden of proof does not shift in this case.  H. Conf.
Rept. 105-599, supra at 240, 1998-3 C.B. at 994.

II.  Exclusion pursuant to Section 104(a)(2)

Respondent determined that the May 1996 payment, the May 1997 payment, and the November 1998 payment are not excludable pursuant to section 104(a)(2).  Respondent also denied petitioner's refund claim (relating to the November 1996 payment) for the same reason.  Petitioner challenges respondent's determination and the denial of his refund claim.[21]

A.  Section 104

As a general rule, the Internal Revenue Code imposes a Federal tax on the taxable income of every individual.  Sec. 1.  Section 61(a) specifies that, "Except as otherwise provided", gross income for purposes of calculating such taxable income means "all income from whatever source derived".  The Supreme Court has long reiterated the sweeping scope of section 61.  Commissioner v. Schleier, 515 U.S. 323, 327 (1995); Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 429-431 (1955).

Section 104, in contrast, provides an exception with respect to compensation for injuries or sickness.  Such exclusions from gross income are construed narrowly.  Commissioner v. Schleier, supra at 328; United States v. Burke, 504 U.S. 229, 248 (1992) (Souter, J., concurring in judgment); Banaitis v. Commissioner, 340 F.3d 1074, 1079 (9th Cir. 2003), affg. in part and revg. in part T.C. Memo. 2002-5.  Before its amendment on August 20, 1996,

---

[21]  We note that we have jurisdiction to determine whether there was an overpayment of tax for 1996.  Secs. 6512(b), 7422(e).

by the Small Business Job Protection Act of 1996 (SBJPA), Pub. L. 104-188, sec. 1605, 110 Stat. 1838, section 104 read in pertinent part as follows (pre-SBJPA section 104):

SEC. 104. COMPENSATION FOR INJURIES OR SICKNESS.

(a) In General.--Except in the case of amounts attributable to (and not in excess of) deductions allowed under section 213 (relating to medical, etc., expenses) for any prior taxable year, gross income does not include--

* * * * * * *

(2) the amount of any damages received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal injuries or sickness;

The reference to personal injuries in this former version of the statute did not include purely economic injuries but did embrace "nonphysical injuries to the individual, such as those affecting emotions, reputation, or character". United States v. Burke, supra at 235 n.6, 239; see Commissioner v. Schleier, supra at 329-331; Roemer v. Commissioner, 716 F.2d 693 (9th Cir. 1983) (holding that compensation paid for defamation, as defined by California law, is excludable from income pursuant to pre-SBJPA section 104), revg. 79 T.C. 398 (1982); see also Threlkeld v. Commissioner, 87 T.C. 1294 (1986) (aligning the Court with the decision in Roemer), affd. 848 F.2d 81 (6th Cir. 1988).

The SBJPA then amended section 104, as relevant here, to provide (post-SBJPA section 104):

SEC. 104. COMPENSATION FOR INJURIES OR SICKNESS.

(a) In general.--Except in the case of amounts attributable to (and not in excess of) deductions

allowed under section 213 (relating to medical, etc., expenses) for any prior taxable year, gross income does not include--

  *  *  *  *  *  *  *

  (2) the amount of any damages (other than punitive damages) received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal physical injuries or physical sickness;

  *  *  *  *  *  *  *

* * * For purposes of paragraph (2), emotional distress shall not be treated as a physical injury or physical sickness.  The preceding sentence shall not apply to an amount of damages not in excess of the amount paid for medical care * * * attributable to emotional distress.

The legislative history accompanying passage of the SBJPA additionally clarifies that "the term emotional distress includes symptoms (e.g., insomnia, headaches, stomach disorders) which may result from such emotional distress."  H. Conf. Rept. 104-737, at 301 n.56 (1996), 1996-3 C.B. 741, 1041.  Post-SBJPA section 104 is effective for amounts received after August 20, 1996.  SBJPA, sec. 1605(d), 110 Stat. 1839.

Regulations promulgated under section 104 further define "damages received (whether by suit or agreement)" as "an amount received (other than workmen's compensation) through prosecution of a legal suit or action based upon tort or tort type rights, or through a settlement agreement entered into in lieu of such prosecution."  Sec. 1.104-1(c), Income Tax Regs.

For purposes of applying the above statutory and regulatory text in effect before the SBJPA, the U.S. Supreme Court in

Commissioner v. Schleier, supra at 336-337, established a two-pronged test for ascertaining a taxpayer's eligibility for the section 104(a)(2) exclusion. "First, the taxpayer must demonstrate that the underlying cause of action giving rise to the recovery is 'based upon tort or tort type rights'; and second, the taxpayer must show that the damages were received 'on account of personal injuries or sickness.'" Id. at 337; Banaitis v. Commissioner, supra at 1079. This test has since been extended to apply to post-SBJPA section 104, with the corresponding change that the second prong now requires proof that the personal injuries or sickness for which the damages were received were physical. Shaltz v. Commissioner, T.C. Memo. 2003-173; Henderson v. Commissioner, T.C. Memo. 2003-168; Prasil v. Commissioner, T.C. Memo. 2003-100.

B.    Did Petitioner Make a Tort Claim?

Respondent argues that petitioner's claims regarding his termination did not sound in tort.

The determination of whether a settlement payment is exempt pursuant to section 104 depends on the nature of the claim settled and not on the validity of the claim. Robinson v. Commissioner, 102 T.C. 116, 126 (1994), affd. in part, revd. in part and remanded on another issue 70 F.3d 34 (5th Cir. 1995); Seay v. Commissioner, 58 T.C. 32, 37 (1972). The determination of the nature of the claim is a factual one based on an examination of all the evidence. Robinson v. Commissioner,

supra; Stocks v. Commissioner, 98 T.C. 1, 11 (1992); Seay v. Commissioner, supra.

Respondent does not argue that defamation is not a tort under the law of California. See Roemer v. Commissioner, supra (holding that defamation is a cause of action based upon tort or tort type rights). Respondent contends that petitioner "did not have a viable defamation claim against UTA." Viability of the claim is not a factor that controls the determination of exclusion pursuant to section 104.[22] See Robinson v. Commissioner, supra; Seay v. Commissioner, supra. We conclude that petitioner made tort or tortlike claims against UTA.[23]

C. Whether To Respect the Settlement's Allocation (Whether the Payments Were on Account of the Defamation)

Respondent next argues that the allocation of the payments made in the employment termination agreement and the defamation agreement should not be respected because the allocation occurred in an uncontested, nonadversarial, tax-motivated context.

Generally, an express allocation in the settlement agreement of a portion of the proceeds to tort or tort like claims is binding for tax purposes if the agreement was entered into by the

[22] Viable is defined as "capable of success or ongoing effectiveness". Valid is defined as "legally sound". Webster's II New Riverside University Dictionary 1274, 1285 (1994). Accordingly, a cause of action could be valid (legally sound) but not viable (winnable).

[23] We note that respondent does not refer to the other claims in addition to defamation, including intentional infliction of emotional distress and invasion of privacy, contained in the complaint.

parties in an adversarial context at arm's length and in good faith. Bagley v. Commissioner, 105 T.C. 396, 406 (1995), affd. 121 F.3d 393 (8th Cir. 1997); Robinson v. Commissioner, 87 T.C. at 127; Threlkeld v. Commissioner, supra at 1306-1307; Fono v. Commissioner, 79 T.C. 680, 694 (1982), affd. without published opinion 749 F.2d 37 (9th Cir. 1984).

We found the testimony of numerous witnesses who testified that the settlement negotiations between UTA and petitioner were adversarial, at arm's length, and in good faith to be credible. The settlement negotiations involved two hard-nosed parties who fought over almost every point in the agreement. At no time during the settlement negotiations was petitioner or his counsel able to dictate settlement terms to UTA or UTA's counsel, or vice versa.

UTA's principals and UTA's counsel were formidable and experienced negotiators and were qualified to handle the negotiation of all aspects of the defamation agreement and the employment termination agreement. Mr. Berkus was a sophisticated, experienced negotiator. UTA believed that the release of petitioner's defamation claim against UTA was a necessary and material part of the settlement. UTA would not have agreed to settle with petitioner if petitioner had not given a release of legal claims, including the defamation claim, to UTA as part of the settlement.

Respondent specifically argues that the allocation of $4 million to the defamation claim was not adversarial. We disagree. The allocation of the $4 million of the settlement payments to petitioner's defamation claim was at arm's length, in good faith, and part of an adversarial negotiation.[24]

Respondent points to the fact that Mr. Dunham did not object to the allocation of $4 million in the settlement agreement to the defamation claim. We see no reason why UTA's counsel would object to a term his clients negotiated. Mr. Dunham stated that one reason that the $4 million allocation was not contested when the settlement documents were being exchanged was that the allocation was consistent with the agreement the parties had reached. The record evidences that the agreement was reached as part of an adversarial confrontation.

During the negotiations, UTA disputed several issues in the defamation agreement relating to the tax treatment of the settlement payments including the allocation of the settlement payments among petitioner's defamation and other claims. Mr. Berkus initially objected to the allocation of $4 million to the defamation claim; however, UTA ultimately agreed to this allocation. This was just one of many issues on which compromises were reached. The allocation contained in the

---

[24] We note that UTA did not want to admit to anyone that it had defamed petitioner.

- 48 -

settlement documents was consistent with the agreement reached by UTA and petitioner.

The final settlement documents were negotiated back and forth between petitioner's and UTA's attorneys. The allocation was negotiated before Mr. Cohen, petitioner's tax counsel, prepared the settlement documents, and these documents reflected the settlement that had already been negotiated between petitioner and UTA.

Respondent argues that the following language contained in the April 24, 1996, letter proves that the allocation was not arm's length or adversarial:

> UTA will cooperate with Mr. Polone in his efforts to obtain the most favorable tax treatment for the payments described above, and in the event that UTA incurs liability due to a challenge by the IRS of tax treatment requested of UTA by Mr. Polone, Mr. Polone will indemnify UTA.

Given the acerbic relationship between petitioner and UTA, it is understandable why this language was inserted into the April 24, 1996, letter. Witnesses credibly testified that petitioner feared that UTA would attempt to sabotage the legitimate tax treatment petitioner was entitled to under the defamation agreement.

We note that petitioner's attorneys testified that they estimated the breach of contract claim to be worth $8 million and the defamation claim to be worth $12 million--i.e., that 60 percent of the total damages should be allocated to the defamation claim. The parties settled upon an allocation of $4

million for the defamation claim and $2 million plus the back-end payments for the breach of contract claim. At the time of the settlement, the back-end payments were estimated to be worth approximately $2 million. This meant that at the time of the settlement (and allocation), the parties allocated only 50 percent (10 percent less than petitioner initially sought) to the defamation claim. By the time of trial, the back-end payments significantly exceeded $2 million and were continuing to be made to petitioner. Accordingly, even less than 50 percent of the settlement actually was allocated to the defamation claim.

Upon the basis of all the facts and circumstances, we believe that UTA intended that the $4 million UTA paid petitioner pursuant to the defamation agreement was to settle petitioner's defamation claim and that this amount was appropriately allocated to this claim.

At the end of the trial, respondent conceded that if we respected the allocation of the settlement, then the May 1996 payment is excludable from income pursuant to pre-SBJPA section 104(a)(2). Accordingly, this resolves petitioner's 1996 tax year.[25]

---

[25] Respondent's concession also means that there is no understatement or underpayment for 1996. Accordingly, petitioner is not liable for the sec. 6662 penalty for 1996. Secs. 6662(a), (d), 6664(a).

D.    The Remaining Three Payments

The remaining dispute between the parties mainly turns upon which version of section 104 is applicable to the November 1996 payment, the May 1997 payment, and the November 1998 payment (the three payments).  Respondent contends that post-SBJPA section 104 is applicable; petitioner makes two arguments why pre-SBJPA section 104 is applicable.  If post-SBJPA section 104 applies, the three payments are not excludable from income because petitioner did not suffer a physical injury.

1.    Amount Realized

Petitioner's first argument is that post-SBJPA section 104 is inapplicable to the three payments because UTA's obligation to make the three payments constituted an amount realized for tax purposes in May 1996 (before the amendment of section 104 by the SBJPA).[26]  This argument fails for several reasons.

In construing section 104, our task is to give effect to the intent of Congress.  We begin with the statutory language, which is the most persuasive evidence of the statutory purpose.  United States v. Am. Trucking Associations, Inc., 310 U.S. 534, 542-543 (1940); Hospital Corp. of Am. v. Commissioner, 107 T.C. 116, 128 (1996) affd 348 F.3d 136 (6th Cir. 2003).

---

[26]  Petitioner cites, among other things, private letter rulings (PLRs) to support this argument.  Parties are statutorily proscribed from citing PLRs as precedent.  Sec. 6110(k)(3) (formerly sec. 6110(j)(3)); Willamette Indus., Inc. v. Commissioner, 118 T.C. 126, 134 n.10 (2002).

The plain meaning of statutory language ordinarily is conclusive. United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241-242 (1989); Hospital Corp. of Am. v. Commissioner, supra. If the language of a statute is clear, we look no further than that language in determining the meaning of the statute. See Sullivan v. Stroop, 496 U.S. 478, 482 (1990); United States v. Ron Pair Enters., Inc., supra at 241. A court looks to legislative history only if the statute is unclear. Blum v. Stenson, 465 U.S. 886, 896 (1984); United States v. Lewis, 67 F.3d 225, 228-229 (9th Cir. 1995).

The plain language of the statute, both pre- and post-amendment by the SBJPA, refers to the amount of damages "received", not the amount "realized". Sec. 104(a)(2); see also SBJPA sec. 1605(d)(1) ("the amendments made by this section shall apply to amounts received after the date of the enactment of this Act, in taxable years ending after such date" (emphasis added)). Petitioner's "realization" argument ignores the plain language of the statute. Petitioner did not receive the three payments before August 20, 1996.

Additionally, amounts are included in gross income for the taxable year in which they are received by the taxpayer. Sec. 451(a); Knoll v. Commissioner, T.C. Memo. 2003-277 (applying this principle in the context of a section 104 case). Petitioner received the May 1997 payment and the November 1998 payment in 1997 and 1998 (and the November 1996 payment after August 20,

1996). Accordingly, the receipt of the payments in 1997 and 1998 by petitioner, a cash basis taxpayer, results in income taxable in petitioner's 1997 and 1998 tax years.[27] See Knoll v. Commissioner, supra.

Furthermore, petitioners argue that the three payments had an ascertainable fair market value in May 1996. Even if petitioner's execution of the settlement agreements constituted a disposition of property,[28] there is no evidence in the record of the fair market value of the three payments in May 1996. No expert reports were submitted, and no experts testified at trial regarding the fair market value of the three payments in May 1996. There is not even lay testimony regarding the fair market value of the three payments in May 1996. Accordingly, the evidence does not establish that the three payments, or UTA's obligation to make the three payments, had an ascertainable fair market value in May 1996.[29] The evidence does not establish that

---

[27] Petitioner does not argue that the $2 million lump-sum and the back-end payments paid to settle the breach of contract claim should also be included in petitioner's income in 1996 (thereby increasing the deficiency for 1996) under his amount realized theory.

[28] We have previously rejected the argument that a taxpayer's execution of an agreement to settle a lawsuit regarding his termination by his former employer constitutes a disposition of property. Alexander v. Commissioner, T.C. Memo. 1995-51, affd. 72 F.3d 938 (1st Cir. 1995); see Nahey v. Commissioner, 111 T.C. 256 (1998), affd. 196 F.3d 866 (7th Cir. 1999).

[29] The marketability of these payments is further suspect given the confidentiality (nondisclosure) provisions contained in
(continued...)

the defamation agreement was a cash equivalent--i.e., that it was assignable or contained a promise to pay that was frequently transferred to lenders or investors at not substantially greater than the generally prevailing premium for the use of money. Cowden v. Commissioner, 289 F.2d 20 (5th Cir. 1961), revg. 32 T.C. 853 (1959). We also note that UTA was unwilling to pay the entire $4 million as a lump sum "up front". See Jombo v. Commissioner, T.C. Memo. 2002-273.

    2.   Constitutionality of Section 104

    Petitioner's second argument is that post-SBJPA section 104 is unconstitutional because it is retroactive and violates due process.

    Post-SBJPA section 104 is not retroactive. Venable v. Commissioner, T.C. Memo. 2003-240 n.1. SBJPA section 1605(d)(1) provides that the amendments made by SBJPA section 1605 shall apply to amounts received after the date of the enactment of the SBJPA, in taxable years ending after such date. SBJPA section 1605(d)(2) provided an exception to this rule for amounts received under a written binding agreement, court decree, or mediation award in effect (or issued on or before) September 13, 1995. Accordingly, post-SBJPA section 104 applies only to amounts received after its effective date; it does not affect the

---

    [29](...continued)
the settlement agreements.

inclusion or exclusion from income of amounts received before its effective date.

Even if post-SBJPA section were retroactive, it would not run afoul of the standard for retroactivity of tax laws. In Landgraf v. USI Film Prods., 511 U.S. 244, 280 (1994), the Supreme Court stated the following rule:

> When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach. If Congress has done so, of course, there is no need to resort to judicial default rules. When, however, the statute contains no such express command, the court must determine whether the new statute would have retroactive effect, i.e., whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.

Hence, the threshold question is whether Congress expressly provided that the disputed statute should apply retroactively or prospectively.

While the Supreme Court has indicated that "A statement that a statute will become effective on a certain date does not even arguably suggest that it has any application to conduct that occurred at an earlier date", Landgraf v. USI Film Prods., id. at 257, the text of SBJPA section 1605(d)(1) constitutes markedly more than "the mere promulgation of an effective date", INS v. St. Cyr, 533 U.S. 289, 317 (2001). SBJPA section 1605(d)(1) does not just state when the law is to take effect. Rather, the

provision explicitly dictates the particular conduct and the timing thereof to which the amendments "shall apply". According to the express text, receipt of payments after the August 20, 1996, date of enactment falls within the intended scope of the post-SBJPA section 104, unless the explicit exception for a prior binding agreement, court decree, or mediation award is applicable.

Here, a final, written, and binding settlement agreement was not entered into until 1996. Petitioner's situation therefore fails to satisfy the requisites for relief under SBJPA section 1605(d)(2). In that event, SBJPA section 1605(d)(1) explicitly and unambiguously prescribes the temporal reach of the section 104 amendments to the situation at hand. We conclude that Landgraf v. USI Film Prods., supra, would pose no barrier here to application of post-SBJPA section 104.

Moreover, less than 2 months after issuing its decision in Landgraf, the Supreme Court decided United States v. Carlton, 512 U.S. 26 (1994). The issue in United States v. Carlton, supra at 27, was the propriety of retroactive application of an amendment to a Federal estate tax statute. In that context, the Supreme Court explained as follows:

> This Court repeatedly has upheld retroactive tax legislation against a due process challenge. Some of its decisions have stated that the validity of a retroactive tax provision under the Due Process Clause depends upon whether retroactive application is so harsh and oppressive as to transgress the constitutional limitation. The harsh and oppressive

formulation, however, does not differ from the prohibition against arbitrary and irrational legislation that applies generally to enactments in the sphere of economic policy.  The due process standard to be applied to tax statutes with retroactive effect, therefore, is the same as that generally applicable to retroactive economic legislation: * * * that burden is met simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose.  [Id. at 30-31; internal quotations and citations omitted.]

The Supreme Court further noted:

"Taxation is neither a penalty imposed on the taxpayer nor a liability which he assumes by contract.  It is but a way of apportioning the cost of government among those who in some measure are privileged to enjoy its benefits and must bear its burdens.  Since no citizen enjoys immunity from that burden, its retroactive imposition does not necessarily infringe due process * * * "  [Id. at 33 (quoting Welch v. Henry, 305 U.S. 134, 146-147 (1938)).]

In general, the raising of Government revenue is considered a sufficient and legitimate legislative purpose for supporting a "modest" period of retroactivity.  Id. at 32-33; id. at 37 (O'Connor, J., concurring in judgment); NationsBank v. United States, 269 F.3d 1332, 1337-1338 (Fed. Cir. 2002); Quarty v. United States, 170 F.3d 961, 967 (9th Cir. 1999); Furlong v. Commissioner, 36 F.3d 25, 27-28 (7th Cir. 1994), affg. T.C. Memo. 1993-191.  The principal exception to this reasoning discernible from caselaw arises in scenarios involving imposition of a "wholly new tax".  See United States v. Carlton, supra at 34; Quarty v. United States, supra at 966-967; Furlong v. Commissioner, supra at 27; Wiggins v. Commissioner, 904 F.2d 311, 314 (5th Cir. 1990), affg. 92 T.C. 869 (1989).

The imposition of a wholly new tax is to be distinguished from changes in the rate of an existing tax. United States v. Darusmont, 449 U.S. 292, 298-300 (1981); Quarty v. United States, supra at 966-967; Honeywell, Inc. v. United States, 973 F.2d 638, 642-643 (8th Cir. 1992); Estate of Ekins v. Commissioner, 797 F.2d 481, 484-485 (7th Cir. 1986); Fein v. United States, 730 F.2d 1211, 1212-1214 (8th Cir. 1984); Estate of Ceppi v. Commissioner, 698 F.2d 17, 20-21 (1st Cir. 1983), modifying 78 T.C. 320 (1982). Furthermore, amendments which eliminate an exemption, exclusion, or tax credit have repeatedly been construed as "'closer in kind and in effect to a mere increase in the tax rate than to the enactment of a wholly new tax.'" Honeywell, Inc. v. United States, supra at 642-643 (quoting Fein v. United States, supra at 1213); see also Estate of Ekins v. Commissioner, supra at 484-485; Estate of Ceppi v. Commissioner, supra at 17, 21.

Turning to the case at bar, the SBJPA amendments to section 104 restricted the availability of an exclusion from gross income. In that instance, retroactivity would not be constitutionally objectionable on grounds related to a wholly new tax. Accordingly, petitioner's situation does not present reason for departure from the standards typically employed to evaluate tax legislation.

As regards legitimate governmental purpose, the legislative history accompanying the SBJPA notes that "Courts have interpreted the exclusion from gross income of damages received on account of personal injury or sickness broadly in some cases to cover awards for personal injury that do not relate to a physical injury or sickness." H. Conf. Rept. 104-737, at 300 (1996), 1996-3 C.B. 741, 1040. Congress's choice to narrow the exclusion, and any retroactive application of the change, would therefore appear to be rationally linked to the legitimate objective of raising revenue. The legislative history further reveals that the change was intended as a curative measure designed to reduce or eliminate ambiguity in the otherwise applicable law. Reference is made to "confusion" that "led to substantial litigation", including the Supreme Court cases of Commissioner v. Schleier, 515 U.S. 323 (1995), and United States v. Burke, 504 U.S. 229 (1992). H. Rept. 104-586, at 143 (1996), 1996-3 C.B. 331, 481.

In addition, the period of "retroactivity" alleged by petitioner in this case does not exceed what has been upheld in other tax litigation. See, e.g., Licari v. Commissioner, 946 F.2d 690 (9th Cir. 1991) (upholding application of tax penalty passed in 1986 to returns previously filed for years 1982 through 1984), affg. T.C. Memo. 1990-4; Canisius Coll. v. United States, 799 F.2d 18, 26-27 (2d Cir. 1986) (upholding 4-year retroactive application); Temple Univ. v. United States, 769 F.2d 126 (3d

Cir. 1985) (upholding at least a 4-year retroactive application); Rocanova v. United States, 955 F. Supp. 27 (S.D.N.Y. 1996) (upholding retroactive application of amendment extending statute of limitation on tax collection actions from 6 to 10 years), affd. 109 F.3d 127 (2d Cir. 1997). "The Supreme Court has never explicitly imposed a time limit on the retroactivity of a tax statute's application." Wiggins v. Commissioner, supra at 316.

To the extent petitioner raises issues of retroactivity, application of the SBJPA amendments to section 104 would not violate the standards requiring a rational purpose and reasonable period. The tests employed to evaluate retroactive legislation therefore do not justify refusal to apply the law in effect for the tax years under consideration. We conclude that post-SBJPA section 104 is neither retroactive nor unconstitutional.[30] See Young v. United States, 332 F.3d 893 (6th Cir. 2003); Venable v. Commissioner, T.C. Memo. 2003-240.

E. Conclusion

Petitioner's arguments for the application of pre-SBJPA section 104 to the three payments fails. There is no evidence of how much, if anything, petitioner spent for medical care for emotional distress. Therefore, petitioner failed to meet his

---

[30] We note that petitioner also argues that he could have avoided the application of post-SBJPA sec. 104 by receiving an up-front payment. We disagree. UTA would not, and did not, agree to an up-front, lump-sum payment.

burden of proving that any amount was spent for medical care for emotional distress.  See sec. 104(a) (flush language). Petitioner did not suffer a physical injury as a result of his termination by UTA.  Accordingly, the three payments are not excludable pursuant to post-SBJPA section 104.

Accordingly, we hold that:  (1) Petitioner is not liable for the deficiency determined by respondent for 1996; (2) petitioner is not entitled to an overpayment for 1996; and (3) petitioner is liable for the deficiency determined by respondent for 1997 and 1998.

## III.  Section 6662 Penalty

Respondent argues that petitioner is liable for the section 6662 penalty for 1997 and 1998.[31]  Pursuant to section 6662(a), a taxpayer may be liable for a penalty of 20 percent of the portion of an underpayment of tax due to negligence or disregard of rules or regulations or a substantial understatement of income tax. Sec. 6662(b).  An "understatement" is the difference between the amount of tax required to be shown on the return and the amount of tax actually shown on the return.  Sec. 6662(d)(2)(A).  A "substantial understatement" exists if the understatement exceeds the greater of (1) 10 percent of the tax required to be shown on

---

[31]  See _supra_ note 25 regarding 1996.

the return for a taxable year or (2) $5,000. See sec. 6662(d)(1).

Section 7491(c) provides that the Commissioner shall bear the burden of production with respect to the liability of any individual for penalties. If a taxpayer files a petition alleging some error in the determination of the penalty, the taxpayer's challenge will succeed unless the Commissioner produces evidence that the penalty is appropriate. Swain v. Commissioner, 118 T.C. 358, 364 (2002). "The Commissioner's burden of production under section 7491(c) is to produce evidence that it is appropriate to impose the relevant penalty". Id. at 363; see also Higbee v. Commissioner, 116 T.C. at 446. The Commissioner, however, does not have the obligation to introduce evidence regarding reasonable cause or substantial authority. Higbee v. Commissioner, supra at 446.

The evidence establishes that understatements for 1997 and 1998 exceed the greater of 10 percent of the tax required to be shown on the returns for 1997 and 1998 or $5,000. Accordingly, respondent has met his burden of production.

The accuracy-related penalty is not imposed with respect to any portion of the underpayment as to which the taxpayer acted with reasonable cause and in good faith. Sec. 6664(c)(1). The decision as to whether the taxpayer acted with reasonable cause and in good faith depends upon all the pertinent facts and

circumstances.  Sec. 1.6664-4(b)(1), Income Tax Regs.  Relevant factors include the taxpayer's efforts to assess his proper tax liability, including the taxpayer's reasonable and good faith reliance on the advice of a professional.  See id.

The record establishes that petitioner reasonably and in good faith relied on his return preparers and attorneys. Petitioner fully disclosed the facts surrounding the settlement payments to his return preparers and attorneys.  Petitioner directed his return preparers to report the settlement payments from UTA in the clearest and most proper way.  His return preparers consulted with tax attorneys before preparing petitioner's returns in issue.

Consequently, we conclude that for 1997 and 1998 petitioner had reasonable cause and acted in good faith as to any underpayment resulting from the exclusion of the May 1997 payment and the November 1998 payment.  Accordingly, we hold that petitioner is not liable for the penalty pursuant to section 6662(a).[32]

---

[32]  We note that sec. 6662(d)(2)(B) provides an additional basis for relieving petitioner from the sec. 6662 penalty-- petitioner adequately disclosed the relevant facts regarding the payments he received pursuant to the defamation agreement on his 1997 and 1998 tax returns.

In reaching all of our holdings herein, we have considered all arguments made by the parties, and to the extent not mentioned above, we find them to be irrelevant or without merit.

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.